UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FRANKLIN D. SNYDER,

     Plaintiff,

-vs-           Case No.  5:12-cv-439-Oc-10PRL

FEDERAL-MOGUL CORPORATION,

     Defendant.

_____/

## **O R D E R**

   Plaintiff Franklin D. Snyder is a beneficiary and participant in a retiree medical benefit plan administered by Defendant Federal-Mogul Corporation.  Snyder alleges that Federal-Mogul violated his rights under the Employee Retirement Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") when Federal-Mogul unilaterally modified his medical benefits.  The changes increased the annual deductible and the minimum co-pay for prescription drugs, and eliminated dental and vision coverage (Doc. 1).  Snyder seeks judicial review pursuant to 29 U.S.C. § 1132(a)(1)(B) of Federal-Mogul's determination that he and his spouse are not exempt from these plan modifications. He requests a declaration of his rights under the health plan, and recovery of his expenses and attorney's fees and costs.

   The Parties agree that the medical plan(s) at issue in this case are governed by ERISA, and they have filed cross-motions for summary judgment (Docs. 16-17), with responses in opposition (Docs. 21, 23).  The Court also heard oral argument on

January 31, 2014 (Doc. 32).  For the reasons discussed below, the Court concludes that Federal-Mogul's motion is due to be granted, and Snyder's motion is due to be denied.

### Undisputed Material Facts

Snyder commenced employment with Champion Spark Plug, Inc. on September 1, 1967, and was transferred to Champion Spark Plug Limited on January 1, 1987. Champion Spark Plug Limited is a wholly owned subsidiary and division of Cooper Industries, Inc.  (hereinafter "Cooper/Champion").  Snyder worked as an executive for Cooper/Champion until June 30, 1990, when he and the Company mutually agreed to end his employment.  At the time his employment terminated, Snyder was the Vice President and General Manager of Champion Spark Plug Canada.

### I.      The Settlement Agreement

On July 26, 1990, Snyder and Cooper/Champion entered into a Settlement Agreement and Release (the "Settlement Agreement") which, among other things, provided for monthly payments to Snyder of $8,145 for 18 months, as well as pension contributions and participation in other specified retirement and stock option plans during that period (Doc. 18-1, Ex. 1).  With respect to health and welfare benefits, the Settlement Agreement provided:

> During the period in which the above mentioned monthly payments are due, Snyder and his spouse will continue to be covered under the Champion Health Care Benefit Plan which is currently in effect, with the cost of said coverage identified as Hospitalization, Surgical, Medical,

> Dental, Drug, Audio and Vision Care (H, S, M, D, D, A, V) to be paid by Cooper/Champion.  After the expiry of the period in which the monthly payments are due, Snyder and his spouse will be entitled to continue benefits on the same terms and conditions as are provided to Cooper/Champion salaried retirees as of July 1, 1990.

(Doc. 18-2, Ex. 1, ¶ 5).

The Settlement Agreement did not otherwise define the "terms and conditions" of continuing benefits.  Snyder claims that a three-page document entitled "Your Benefits At Retirement" was attached to the Settlement Agreement.  This document is dated July 26, 1990, the same date as the Settlement Agreement, and is initialed by Snyder and Morris Davis, the person who also executed the Settlement Agreement on behalf of Cooper/Champion (Doc. 18-2, pp. 49-51).  The three-page document states that salaried retirees and their dependents are entitled to continue receiving benefits from Cooper/Champion's health plan, dental plan, vision plan, and life insurance plan. The document then "briefly outlines" the programs.  With respect to the health plan, the document states that: (1) the deductible for medical, hospital, surgical, prescription drugs, and hearing care is $200 per person; (2) covered expenses are paid at 80% after deductible; and (3) the plan administrator is Aetna Life Insurance Company (Doc. 18-2, p. 49).  The document further provides that when a retiree or his dependent reaches age 65, they will be eligible for Medicare Parts A and B, and that Cooper/Champion will reimburse the retiree for the monthly Medicare Part B premium. (Doc. 18-2, p. 51).  The document does not state that retiree health benefits are vested,

frozen, or immutable, nor does the document otherwise explain the types of coverage and benefits provided.

Snyder contends that this three-page document was incorporated into the Settlement Agreement and establishes, along with the Settlement Agreement itself, that he was vested in the health plan such that his benefits could never change. The Court agrees that the document should be considered as part-and-parcel of the Settlement Agreement. It was dated the same date and initialed by the same person who signed the Settlement Agreement on behalf of Cooper/Champion. There is no suggestion that Morris Davis would have had any reason to initial that document on that date other than in connection with the Snyder settlement package. It does not follow, however, that the document operated to vest Snyder with the health benefits then in effect without possibility of future modification.

Neither side has submitted a copy of the health plan in effect as of July 1, 1990. Instead, the Parties have provided the Court with a copy of the Summary Plan Description for the health plan, which is entitled "Guide to Your 1990 Flexible Benefits Program" (Doc. 18-2, Ex. 2). The Summary Plan Description provides a more detailed description of the health plan coverage and benefits. On the last page, it contains the statement that "The Company intends to continue this Plan indefinitely, but reserves the right to end or amend it." (Doc. 18-2, Ex. 2, p. 28). Snyder does not dispute that he possessed a copy of this Summary Plan Description.

-4-

## II.    Federal-Mogul's Assumption of Snyder's Health Benefits

The Settlement Agreement contained a survivorship provision stating that "[t]he terms, conditions, duties and responsibilities in this agreement shall survive in the event Cooper/Champion is bought, merged, restructured, reorganized, sold, held in receivership, becomes bankrupt, or otherwise changes ownership or control." (Doc. 18-2, Ex. 1, ¶ 12).

In 1998, Federal-Mogul acquired Cooper Automotive, including Champion Spark Plug Limited.   As a result of that acquisition, Federal-Mogul assumed certain obligations of Cooper/Champion's welfare benefit plans, including the retiree medical plan covering Snyder.  Federal-Mogul continued to pay Snyder's medical plan benefits, and there is no evidence that there were any issues concerning Federal-Mogul's treatment of Snyder until 2006.

By letter dated August 10, 2006, Federal-Mogul notified all of its retirees, including Snyder, that it was modifying its medical and prescription drug program effective September 1, 2006 (Doc. 18-3, pp. 1-2).  The letter stated that medical benefits would be transitioned from Aetna U.S. Healthcare to Blue Cross Blue Shield of Alabama, and that prescription drug benefits would transition to Medco.  The letter instructed retirees to refer to an enclosed "BCBSAL Matrix" and an attached prescription drug benefit fact sheet for additional information regarding plan benefits. (Id.).  The attached documents, which consisted of a Summary Plan Description for the

"Federal-Mogul Corporation Medical Retiree Plan B" Group Health Care Plan, and a Medco prescription drug worksheet, established that the annual health plan deductible would increase from $200 to $400 per person and from $400 to $800 for family coverage.   The annual out-of-pocket maximum would also increase from $1000 to $2000 per person and from $2000 to $4000 for families.   (Id., pp. 4, 32).   The new health plan also established a $750,000 lifetime maximum where none previously existed, and it increased the prescription drug co-pay from $2 to $7-$25 for generic drugs and $10-$50 for non-generic drugs (Id., pp. 7, 32).[1]

The August 10, 2006 letter further stated that "Federal-Mogul and its companies will continue to try to control medical costs without unduly impacting employees and retirees, however as in the past, Federal-Mogul reserves the right to modify, amend, interpret or terminate the Plan at any time when it deems it necessary." (Doc. 18-3, p. 2).   The Summary Plan Description for the new 2006 health plan contained similar language:   "Although Federal-Mogul's intent is to continue this Plan indefinitely it retains the right to modify, change, amend, construe, interpret or terminate the Plan when it deems necessary, with a majority vote of the Plan Administration Committee."

---

[1]Snyder contends that he did not receive the first five pages of the attached summary plan description, which consisted of benefits summary charts explaining the changes to his medical benefits, or the prescription drug benefit fact sheet until sometime in late 2010.  He further asserts that he never received a copy of the Summary Plan Description for the Federal-Mogul Group Health Care Plan that was attached to the August 10, 2006 letter.  However, Snyder admits that he did receive the August 10, 2006 letter at the time it was originally mailed in 2006.

(Doc. 18-3, p. 31).  This language was repeated in the benefit summary charts as well:
"The Company reserves the right to change any or all plans." (Doc. 18-3, pp. 4-6).

Snyder never objected to Federal-Mogul's 2006 modification of his health and prescription drug plans, and did not assert at that time any claim that his Settlement Agreement vested his health benefits such that they could not be changed.[2]

By letter dated May 21, 2010, Federal-Mogul notified all retirees, including Snyder, that it intended to "modify the health care benefits provided to active employees and eliminate retiree medical coverage effective June 30, 2010." (Doc. 16-7).  Federal-Mogul sent a second letter dated June 23, 2010 stating that it would no longer provide Medicare Part B supplements or subsidy payments to retirees after June 1, 2010 (Doc. 16-10).

Snyder contacted Federal-Mogul by phone and wrote to Federal-Mogul's benefits plan administrator on June 30, 2010 to object to the cancellation of his health benefits. (Doc. 16-8).  Snyder specifically referenced his Settlement Agreement, and argued that pursuant to the terms of that Agreement, he was entitled to continue benefits on the same terms and conditions as were provided Cooper/Champion salaried retirees on July 1, 1990.  Snyder further argued that his Settlement Agreement "fixes the 'benefits'

---

[2]Snyder admits that he did not object, claiming that he "did not believe action was available or warranted" because he interpreted the August 10, 2006 to only be a change to the company providing health care benefits, and because the letter mentioned that Federal-Mogul was still in Chapter 11 bankruptcy(Doc. 18-1, Affidavit of Franklin D. Snyder, ¶ 3).

that I negotiated," and included Medicare Part B benefits, at no cost to Snyder or his wife. (Id.).

Federal-Mogul wrote to Snyder on June 30, 2010, and agreed to extend Snyder's healthcare coverage until September 30, 2010 while it reviewed his objections. (Doc. 18-3, p. 51).   On September 13, 2010, Federal-Mogul wrote to Snyder that it was continuing to review his objections, and would continue to extend his healthcare coverage during the review process. (Doc. 16-9).   Federal-Mogul further stated that it "has always reserved the right to change, amend, or terminate retiree Healthcare plan coverage," and encouraged Snyder to provide any additional documentation he may have to support his position.  (Id.).

While Federal-Mogul continued to review Snyder's objections, Snyder retained counsel, who sent Federal-Mogul a demand letter dated December 10, 2010 (Doc. 16-11).   The demand letter reiterated Snyder's position that Federal-Mogul was bound under the terms of the Settlement Agreement to provide Snyder with healthcare benefits, including reimbursement of Medicare Part B expenditures.   The letter demanded reimbursement of all such expenditures, as well as written documentation from Federal-Mogul that it would continue to honor the Settlement Agreement (Id., p. 4).   Counsel attached the three-page "Your Benefits at Retirement" document to the demand letter as further proof that Snyder was entitled to Medicare Part B reimbursement (Doc. 16-12).

On March 2, 2011, Federal-Mogul wrote to Snyder's counsel and stated that "[u]pon review of the documentation provided by you and Mister Snyder, Federal-Mogul has decided to accept Mister Snyder's interpretation of the severance documents. Federal-Mogul has directed its vendor, J.P. Morgan Chase, to reinstate Medicare Part B reimbursements to Mr. Snyder retroactive to July 1, 2010." (Doc. 16-13). In addition to his Medicare reimbursements, it appears that Snyder continued to receive healthcare benefits under the medical plan that Federal-Mogul transitioned Snyder into on September 1, 2006. There is no evidence that following September 1, 2006, Federal-Mogul ever provided Snyder with healthcare coverage under the deductible and co-pay levels that existed in July 1990.

### III.   The Current Dispute

In November 2011, Federal-Mogul notified its retirees that were still receiving healthcare benefits, including Snyder, that beginning January 1, 2012, Snyder would be enrolled in the health care plan currently available to active employees. (Doc. 16-14). The notice stated that "this means increased medical deductibles and co-pays, elimination of the vision benefits and changes to the prescription drug program." (Id.). In addition, the notice stated that "the Company indefinitely reserves the right to modify, change, amend, construe, interpret or terminate this Plan or any other welfare plan as it deems necessary." (Id.).

The notice directed Snyder to review enclosed plan design summaries for the new plans. The attached summaries provided that the annual deductible would increase from $400 to $500 per person for in-network providers and to $1000 per person for out-of-network providers, and that prescription drug co-pays would increase to $10-$25 for generic drugs, $30-$50 for preferred brand drugs, and $45-$90 for non-preferred brand drugs (Doc. 16-15, pp. 2, 5).  The summaries further reiterated that "[t]he Company reserves the right to change any or all plans."  (Id., p. 4).

Snyder, through counsel, wrote to Federal-Mogul on January 23, 2012, and made a formal administrative claim under ERISA to have his health and prescription drug benefits reinstated at the same levels in existence in July 1990 (Doc. 16-16). Snyder claimed that Federal-Mogul's decision to enroll Snyder in a different health plan violated his Settlement Agreement.   Snyder further argued that the Settlement Agreement created vested health benefits, and prohibited Federal-Mogul (in its role as successor to Cooper/Champion) from changing those benefits in any manner.  Snyder also referenced Federal-Mogul's March 2, 2011 letter as proof that the Company had previously agreed that Snyder's health benefits had vested.

On February 17, 2012, Federal-Mogul issued its determination letter to Snyder denying his claim.  (Doc. 16-17).  Federal-Mogul stated its position that the Settlement Agreement did not provide for any vested healthcare benefits, but instead incorporated the 1990 Summary Plan Description which clearly gave Federal-Mogul (by way of its predecessor Cooper/Champion) the right to end or amend the health plan at any time.

-10-

Federal-Mogul also pointed out that it had previously modified the health plan in August 2006, which resulted in increased deductibles and prescription drug co-pays, and that Snyder did not object to those modifications.  In addition Federal-Mogul noted that its health plan summary plan descriptions contained a similar reservation of rights clause permitting the Company to "modify, change, amend, construe, interpret, or terminate the Plan when it deems necessary."  (Id., p. 1).

Federal-Mogul further stated that when it canceled all health insurance for retirees in 2010, the Company made an exception for retirees like Snyder who had specific severance agreements.  However, "[t]he Company makes no promise that these exceptions provide a lifetime promise to provide medical coverage or to maintain a specific scope of medical coverage." (Id.).  Federal-Mogul also attempted to clarify that its March 2, 2011 letter only referred to continuing reimbursement of Medicare Part B premiums, and in no way affirmed Snyder's claim that he was entitled to vested benefits at 1990 levels.  Lastly, Federal-Mogul reiterated its right to amend, modify, or terminate its welfare plans at any time, and asserted that the "fact that the Company currently accepts Mr. Snyder's documentation as proof of eligibility for medical coverage does not require the Company to recreate medical programs from twenty-two years ago." (Id., p. 2).

Snyder's counsel wrote to Federal-Mogul again on June 19, 2012 to reiterate Snyder's position concerning the vesting of his health benefits as of July 1990.  (Doc.

16-19, pp. 167-68).   The record does not disclose whether Federal-Mogul ever

responded.  Snyder filed this lawsuit on August 8, 2012.

### Summary Judgment Standard of Review

Because this case involves the review of a plan administrator's decision under

ERISA, where there is no right to a jury trial, see Stewart v. KHD Deutz of America

Corp., 75 F.3d 1522, 1527 (11th Cir. 1996), all of the issues in dispute must be

resolved by the Court as the ultimate trier of fact.  In such circumstances, it is the law

of the Circuit that:

> If decision is to be reached by the court, and there are no issues of
> witness credibility, the court may conclude on the basis of the affidavits,
> depositions, and stipulations before it, that there are no genuine issues of
> material fact, even though decision may depend on inferences to be
> drawn from what has been incontrovertibly proved.   Under those
> circumstances, which may be rare, the judge who is also the trier of fact
> may be warranted in concluding that there was or was not negligence, or
> that someone acted reasonably or unreasonably, . . . even if that
> conclusion is deemed "factual" or involves a "mixed question of fact and
> law."  A trial on the merits would reveal no additional data.  Hearing and
> viewing the witnesses subject to cross-examination would not aid the
> determination if there are neither issues of credibility nor controversies
> with respect to the substance of the proposed testimony.  The judge, as
> trier of fact, is in a position to and ought to draw his inferences without
> resort to the expense of trial.

Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir. 1978).[3]  See also Bee's

Auto, Inc. v. City of Clermont, 927 F. Supp. 2d 1318, 1327 (M.D. Fla. 2013).

---

[3]Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court.  Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1982).

**Discussion**

**I.      The ERISA Standard of Review**

Snyder argues that this case boils down to a question of contract interpretation: did the Settlement Agreement and its associated document adopt by reference the medical benefits plan as it existed in 1990 as a vested right, or did they merely guarantee to Snyder his continuation as a plan participant together with, and on the same footing as, other retirees of Federal-Mogul's predecessor?  Snyder's argument might well have persuasive effect if the Settlement Agreement and the associated document had been made and executed in a contractual vacuum.  But they were not. It cannot be disputed that ERISA governs the case to the point that Snyder's right to pursue a breach of contract claim is preempted.  Indeed Snyder has appropriately brought this suit under ERISA, 29 U.S.C. § 1132(a)(1)(B), "to recover benefits due to him under the terms of his plan . . . ."[4]  As such, all documents pertinent to the relevant ERISA "plan" must be factored into the analysis.

Secondly, even if the case was viewed strictly as a breach of contract action, Snyder would lose.  It is critical that neither the Settlement Agreement or the associated document expressly state that Snyder's health benefits shall be deemed vested and not subject to modification or termination.  Rather, the Settlement

───────────────────────

[4]Although many of the exhibits submitted by Snyder allude to a breach of contract claim based on Federal-Mogul's alleged breach of the terms of the Settlement Agreement, the Parties agree that such a claim would be preempted by ERISA.  See 29 U.S.C. § 1144(a); Pilot Life Ins.v. Dedeaux, 481 U.S. 41, 107 S. Ct. 1549 (1987).

Agreement says that he "will be entitled to continue benefits on the same terms and conditions as are provided to Cooper/Champion salaried retirees as of July 1, 1990." And the plan document that fixes the terms and conditions of the health plan in effect in 1990 is the Summary Plan Description, which clearly states that "The Company intends to continue this Plan indefinitely, but reserves the right to end or amend it."[5] (Doc. 18-2, Ex. 2).  Simply put, there is nothing to suggest that Snyder's benefits were vested by that language or by the relevant plan documents that universally recorded the right of the employer to modify the plan.[6]

The case must be analyzed and decided, therefore, under ERISA jurisprudence. ERISA's statutory text does not articulate a specific standard by which courts are to evaluate a plaintiff's challenge to a plan administrator's benefits determination under

---

[5]At oral argument, counsel for Snyder argued that the Summary Plan Description was not the plan document which set the terms and conditions of Snyder's health benefits, and therefore could not be relied upon to establish whether or not Snyder's health benefits had vested.  This argument is unpersuasive for two reasons. First, ERISA defines summary plan descriptions as one of the many plan documents plan administrators must provide to plan participants, and ERISA mandates that summary plan descriptions set forth the terms and conditions of the health plan in language that can be understood by the average plan participant. See 29 U.S.C. §§ 1022, 1024. Second, the question of whether the language of the Summary Plan Description should govern this case would only become relevant if the language of the plan document differed from that of the Summary Plan Description.  For example, if the plan document stated that the health care benefits were vested and immutable and the Summary Plan Description did not, the Court would be required to follow the language of the plan document. See e.g., Heffner v. Blue Cross and Blue Shield of Alabama, Inc., 443 F.3d 1330 (11th Cir. 2006).  No such argument has been raised in this case, nor could it, as neither side has submitted a copy of the actual health care plan in effect in 1990.

[6]If Snyder's benefits were vested it would put him in an entirely different posture than those receiving the "same terms and benefits as are provided to salaried employees as of June 1, 1990."

§ 1131(a)(1)(B).  Applying principles of trust law, the Supreme Court held in <u>Firestone</u> <u>Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 S. Ct. 948 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Id.</u> at 115, 109 S. Ct. at 956-57.  Where such discretionary language exists in the plan, the Supreme Court has held that the more deferential arbitrary and capricious standard of review applies.  <u>Id.</u> at 110-12, 109 S. Ct. at 953-55.  <u>See</u> <u>also</u> <u>Buckley v. Metropolitan Life</u>, 115 F.3d 936, 939 (11th Cir. 1997).

The Eleventh Circuit has expanded the <u>Firestone</u> standard into a six-step analysis for reviewing a plan administrator's benefits decision:

1.  Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2.  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3.  If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4.  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5.  If there is no conflict, then end the inquiry and affirm the decision.

-15-

6.    If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1137 (11th Cir. 2004).  See also Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1195 (11th Cir. 2010).[7]

The Court's analysis begins and ends with the first step.   Under a *de novo* review, the Court finds that Federal-Mogul's November 2011 decision to modify Snyder's medical benefits effective January 1, 2012 was not wrong.

## II.    The Contract Does Not Vest Health Benefits

Retiree health insurance plans are considered welfare benefit plans as defined by 29 U.S.C. § 1002(1), and are not pension plans under 29 U.S.C. § 1002(2).  This distinction is crucial, because pension plans "are strictly regulated by ERISA and are subject to ERISA's vesting, participation, and minimum funding requirements," whereas welfare benefit plans "which are benefits such as medical insurance that may be ancillary to but are not part of a pension plan, are not subject to these requirements." Alday v. Container Corp. of America, 906 F.2d 660, 663 (11th Cir. 1990).  See also 29 U.S.C. §§ 1051 and 1081 (exempting welfare benefit plans from ERISA's participation,

---

[7]The Supreme Court in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117, 128 S. Ct. 2343, 2351 (2008) rejected a generalized "heightened arbitrary and capricious" test for situations where a conflict of interest exists, and instead held that an individualized inquiry is required.  The Eleventh Circuit has recognized that Glenn implicitly overruled the Circuit's sixth step in the analysis of an administrator's benefits decision, but held that the remaining five steps in the methodology remain intact and should be applied.  Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1359-60 (11th Cir. 2008).  See also Capone, 592 F.3d at 1195-96; Blankenship v. Metropolitan Life Ins. Co., 644 F.3d 1350, 1355 (11th Cir. 2011); White v. Coca-Cola Co., 542 F.3d 848, 854 (11th Cir. 2008).  In any event, the heightened review issue does not impact this case as no party has suggested that Federal-Mogul was operating under a conflict of interest.

vesting, and funding requirements); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90-91, 103 S. Ct. 2890, 2896-97 (1983) (ERISA does not establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans); Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988) ("With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans.  Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables.").   In other words, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."   Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79, 115 S. Ct. 1223, 1228 (1995).

This does not mean that an employer cannot choose to vest retiree medical benefits.  As the Eleventh Circuit has held:  "[t]he [Summary Plan Description] is the statutorily established means of informing participants of the terms of the plan and its benefits. . . .  Accordingly, any retiree's right to lifetime medical benefits at a particular cost can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document."  Alday, 906 F.2d at 665.  See also Owens v. Storehouse, Inc., 984 F.2d 394, 398 (11th Cir. 1993) ("Congress intended employers to be free to create, modify, or terminate the terms and conditions of employee welfare benefit plans as inflation, changes in medical practice and technology, and the costs

of treatment dictate.   Absent contractual obligation, employers may decrease or increase benefits."); Williams v. Wright, 783 F. Supp. 1392, 1397 (S.D. Ga. 1992) ("[E]mployers may contractually bind themselves to provide lifetime welfare benefits by the provisions of the documents establishing the ERISA plan.").

In this case, the Summary Plan Description in effect in July 1990 clearly states that "[t]he Company intends to continue this Plan indefinitely, but reserves the right to end or amend it."  (Doc. 16-3, p. 28).   Thus, by the terms of the Summary Plan Description itself, it is clear that Snyder's health benefits had not vested.  See Alday, 906 F.2d at 664 ("Here, the [Summary Plan Description] clearly provides that the retiree health insurance plan may be terminated or modified.  No basis can be found in the language of the plan documents to contradict [the employer's] reservation of the right to amend or even terminate the plan at any time."); Jones v. American General Life and Acc. Ins. Co., 370 F.3d 1065, 1071 (11th Cir. 2004) ("Because the Plan is unambiguous and precludes vesting of the retiree group life benefit, the district court did not err in granting summary judgment in favor of [the employer]. . . ."). Similar reservation of rights language is contained in the summary plan descriptions in effect in August 2006, as well as in the plan document for the health plan effective January 1, 2012.  See Doc. 16-4, pp. 2, 20; Doc. 16-15, p. 4; Doc. 16-19, p. 185.

Snyder does not challenge this body of ERISA precedential authority.  Instead, he focuses on the Settlement Agreement, and argues that this contract represents a clear and unequivocal intent by Snyder and his former employer to provide Snyder with

-18-

lifetime, vested and immutable health benefits.  Snyder's argument fails for the reasons previously discussed.  In short, neither the language of the Settlement Agreement or its associated document establish that Snyder's health benefits were vested and immutable.

Moreover, even if the Settlement Agreement or the attached document could be interpreted to mean that Snyder's benefits could not be altered, they are not ERISA-governed benefit plan documents, and therefore under the law of this Circuit, cannot operate to create vested health benefits.  See Alday, 906 F.2d at 666.  See also  29 U.S.C. § 1102(b) (stating the requisite features of an ERISA employee benefit plan); 29 U.S.C. § 1022(b) (defining Summary Plan Description).  Where there is a Summary Plan Description that unambiguously sets out the rights of the parties, including a reservation of the right to terminate or modify the plan, it is the law of this Circuit that "there is no need to refer to other communications between the parties to determine the parties' intent. . . .  [T]he terms of the [Summary Plan Description] are controlling and other documents must be ignored."  Alday, 906 F.2d at 666.[8]

_____

[8]The decisions cited by Snyder, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Yard-Man, 716 F.2d 1476 (6th Cir. 1983) and Cole v. ArvinMeritor, Inc., 549 F.3d 1064 (6th Cir. 2008), neither of which are binding precedent on this Court, are inapposite.  Both decisions involved the interpretation of welfare benefit plans that were negotiated between employers and unions via collective bargaining agreements; they did not involve ERISA benefit plans unilaterally instituted by the employer.  Although Cole mentions ERISA, neither case discusses the amendment or modification of ERISA-governed employee benefit plans.  Moreover, the collective bargaining agreements at issue contained  unambiguous language that the employees were entitled to benefits for life, without exception, thereby creating an inference that the parties who negotiated the collective bargaining agreements intended for the

(continued...)

### III.    Testimony of Daniel Light

Snyder has also submitted the deposition testimony of Daniel Light, a former employee in Federal-Mogul's employee benefits department, as proof of Federal-Mogul's intent to vest Snyder with lifetime immutable health benefits.[9]  Mr. Light was an employee of Cooper/Champion and then Federal-Mogul since November 1965, and worked as a pension administrator and employee benefit specialist from 1983 until his retirement on October 2, 2006.  (Doc. 18-2, pp. 6-7).  He was the employee who met with each retiree at the time he or she retired and provided general information concerning the retiree's benefits, including giving each retiree a copy of the three-page "Your Benefits at Retirement" document.  Mr. Light testified it was his understanding

---

[8](...continued)
welfare benefits to vest.  And, when faced with non-union retirees seeking to establish vested health benefits, the Sixth Circuit comports with this Circuit, and has held that in order to create vested health benefits, "the intent to vest 'must be found in the plan documents and must be stated in clear and express language.'" Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir. 1988) (quoting Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937 (5th Cir. 1993)).  See also International Union, United Auto. Workers of Am. v. BVR Liquidating, 190 F.3d 768, 772-73 (6th Cir. 1999) ("The Yard-Man presumption was specifically intended to apply in the context of a collective bargaining agreement.").

[9]In this case, the Court stayed all discovery and first directed the Parties to meet and prepare the administrative record (Doc. 11).  The Parties then agreed to a 90 day discovery period for the purposes of conducting the depositions of Mr. Light and Snyder, and for serving discovery requests (Docs. 12, 13).  Although typically this Court's review of a plan administrator's decision under 29 U.S.C. § 1132(a)(1)(B) is limited to the administrative record, it is appropriate to consider Mr. Light's deposition – the only extrinsic evidence submitted to the Court – under the *de novo* review standard applied at this stage in the review process.  See Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1196 (11th Cir. 2010); Howard v. Hartford Life and Accident Life Ins. Co., 2011 WL 522857 at ** 1-2 (M.D. Fla. 2011).

that retirees received lifetime medical benefits, and that the company would pay all premiums.

However, Mr. Light further testified that at all relevant times he worked exclusively in the pension area – he did not administer any welfare benefits, had no specific knowledge concerning the operation or terms of any retiree health plans, and was unaware that Cooper/Champion has reserved its right in the 1990 health plan to amend or terminate the health plan. (Doc. 18-2, pp. 9-10, 21, 24).  With respect to Snyder, Mr. Light had no specific recollection of ever meeting with Snyder, and was not involved in any manner in the negotiation or execution of Snyder's Settlement Agreement.  (Id., pp. 22-23, 26-27).  Mr. Light further testified that he never made any representations to Snyder or any other retiree concerning the level or scope of available retiree health benefits, or that such benefits could not be amended in the future.  (Id., pp. 23, 25-26).  Accordingly, given Mr. Light's admitted lack of knowledge with respect to the terms of the retiree health plans both in general and as to Snyder, coupled with his lack of involvement in the negotiation and execution of Snyder's Settlement Agreement, the Court finds Mr. Light's testimony has no probative value.

Further, even if Mr. Light had testified that he specifically and expressly told Snyder that his retiree health benefits were vested and immutable for life – representations that would directly contradict the express and unambiguous written reservation of rights contained in the plan documents – such oral representations would be of no effect.  The written terms of an ERISA-governed plan cannot be amended or

modified by oral agreements or representations.  <u>Nachwalter v. Christie</u>, 805 F.2d 956,

960 (11th Cir. 1986).  <u>See</u> <u>also</u> <u>Franklin v. QHG of Dadsden</u>, 127 F.3d 1024, 1029

(11th Cir. 1997); <u>Alday</u>, 906 F.2d at 665-66.  <u>Cf.</u> <u>Kane v. Aetna Life Ins.</u>, 893 F.2d

1283, 1286-87 (11th Cir. 1990) (oral interpretations of plan are not binding where the

provisions of the plan at issue are clear and unambiguous).

## IV.     Other Arguments Raised by Snyder

Snyder has also submitted an affidavit attached to his response in opposition to

Federal-Mogul's motion for summary judgment contending, for the first time, that he did

not receive any of the attachments to the August 10, 2006 notice (which first notified

Snyder that his benefits would be modified) until 2010.  (Doc. 22).  Specifically, Snyder

claims he received the first five pages of the Summary Plan Description, which detailed

the increase in deductibles and prescription drug co-pays, sometime in late 2010 (Doc.

22, p. 2, ¶ 4).  He received the remaining pages of the plan document from his attorney

on February 17, 2012 (<u>Id.</u>).   It appears that Snyder raises these facts both to refute any

claim that he waived his right to challenge the modifications to his retiree health plan

that went into effect in September 2006, and to prove that he never became a

participant in that plan.  In other words, Snyder argues that he has always remained

on the 1990 Cooper/Champion health plan, and that is the only plan which governs this

case.

This argument is flawed both factually and legally.   First, Snyder's affidavit somewhat contradicts his previous testimony that he received the August 10, 2006 notice, recognized that his plan was changing from Aetna to Blue Cross/Blue Shield, and that he chose not to object to the changes.  (Doc. 18-1, ¶ 3).  Second, there is no evidence that Snyder continued to receive benefits under the Cooper/Champion retiree health plan after September 1, 2006, or that this plan even continued to exist.  Third, the Parties agree that Snyder has continued to receive retiree health benefits from Federal-Mogul since September 1, 2006, and there is nothing in the record suggesting that those benefits came from any plan other than the Federal-Mogul plan Snyder was transitioned to.  Notably, Snyder nowhere asserts that his benefit levels – including deductible and co-pay amounts – did not change in 2006.

This claim also fails legally because whether or not Snyder actually received a copy of these plan documents in 2006 does not and would not preclude Federal-Mogul from modifying the plan.  The failure to provide a plan participant or beneficiary a copy of a plan document, including a copy of a summary plan description, is a violation of 29 U.S.C. § 1024(b), and would potentially create a claim against the plan administrator for either statutory damages under 29 U.S.C. § 1132(c), or a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).  See 29 U.S.C. § 1132(c)(1); Lockhart v. Blue Cross Blue Shield of Tennessee, 503 Fed. Appx. 926, 928-29 (11th Cir. Jan. 17, 2013); Castro v. Hartford Life and Acc. Ins. Co., 2011 WL 4889174 at * 8 (M.D. Fla. Oct. 14, 2011).  Snyder has not raised either claim in this case.  And with respect to the

claim for benefits he has raised under § 1132(a)(1)(B), the failure to provide plan documents only becomes relevant if it impacted Federal-Mogul's decision to modify the retiree health plan.  Even assuming Snyder is correct that he did not receive any of the plan documents until late 2010, there is no evidence that such nondisclosure impacted Federal-Mogul's decision to modify the retiree health plan either in 2006 or in 2011.  Larsen v. Airtran Airways, Inc., 2009 WL 4827522 at ** 9-10 (M.D. Fla. Dec. 14, 2009).[10]

Snyder's argument further fails due to the inescapable fact that even if he had always remained a plan participant in the 1990 Cooper/Champion retiree medical plan, that plan clearly and unequivocally reserved the right to amend or terminate the plan benefits.  Thus, any attempt by Snyder to claim he is still a member of the 1990 Plan (assuming the Plan still existed) would not establish any vesting of his retiree medical benefits.

Lastly, Snyder points to his communications with Federal-Mogul in 2010 and 2011 as proof of vesting, as well as an attempt to estop Federal-Mogul from arguing that it has a right to amend or terminate its retiree health plan.  In particular, Snyder relies on Federal-Mogul's March 2, 2011 letter, in which the Company "decided to

_____

[10]For example, there is nothing in the record suggesting that Snyder would have been able to opt-out of the retiree health plan modifications in 2006, and that he missed the time period for opting out when he purportedly did not receive copies of the plan documents in a timely fashion. And, to the extent Federal-Mogul seeks to apply the one-year limitations period set forth in its 2010 Plan to this case, that argument shall be denied.

accept Mister Snyder's interpretation of the severance documents" and agreed to reinstate Medicare Part B reimbursements. (Doc. 16-13).  That letter is ambiguous at best – it does not state that Snyder's retiree health benefits are vested at the levels in existence in 1990.   Rather, it only specifically refers to Medicare Part B reimbursements.  Moreover, in its prior communications with Snyder, including a letter dated September 13, 2010, Federal-Mogul made clear that it "has always reserved the right to change, amend, or terminate retiree Healthcare plan coverage."  (Doc. 16-9). Federal-Mogul reiterated this position in its determination letter of February 17, 2012 (Doc. 16-17).

Even if the March 2, 2011 letter was not ambiguous, it would not create vested benefits.  As this Court discussed *supra*, where there is a Summary Plan Description that unambiguously sets out the rights of the parties, including a reservation of the right to terminate or modify the plan, it is the law of this Circuit that "there is no need to refer to other communications between the parties to determine the parties' intent. . . .  [T]he terms of the [Summary Plan Description] are controlling and other documents must be ignored."  Alday, 906 F.2d at 666.  See also Kane, 893 F.2d at 1285-86; National Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc., 929 F.2d 1558, 1572 (11th Cir. 1991).

In addition, the fact that Federal-Mogul has continued to provide Snyder with retiree health benefits does not establish vesting.  This Circuit has agreed with and adopted the rational of numerous other courts of appeals who "have consistently

rejected the notion that welfare benefits may vest simply because they continue into retirement, particularly when other plan provisions establish that benefits are generally terminable." Jones, 370 F.3d at 1070-71 (citing other circuit cases). See also Nichols v. Alcatel USA, Inc., 532 F.3d 364, 377 (5th Cir. 2008) (quoting Howe v. Varity Corp., 896 F.2d 1107, 1110 (8th Cir. 1990), aff'd, 516 U.S. 489, 116 S. Ct. 1065 (1996) ("[T]he mere fact that employee welfare benefits continue in retirement does not indicate that the benefits become vested for life at the moment of retirement.").[11]

The retiree health benefits provided to Snyder are not vested and immutable, and Federal-Mogul was within its rights, as set forth in the relevant plan documents, to modify the benefits by placing Snyder in a different health plan.

## Conclusion

The Court therefore concludes as a matter of law that the retiree medical benefits provided to Snyder by Federal-Mogul did not vest, and that the Settlement Agreement did not create vested, immutable retiree medical benefits. Pursuant to the law of this Circuit, at all times, Federal-Mogul retained the right to amend, modify, or terminate those benefits. Accordingly, the Court finds that Federal-Mogul's modification of

---

[11]Similarly, Snyder's contention that the statement in the August 10, 2006 notice that "Your health care plan costs have not changed" establishes an intent to vest, is without merit. That sentence clearly referenced the premium payments; the very next sentence stated that "If your health care premium is deducted from your pension it will continue. If you make your health care payment to Federal-Mogul, you will continue to do so." (Doc. 16-4, Ex. 3). The notice nowhere stated - explicitly or implicitly - that deductibles and co-pays would not change. In fact that is exactly what did happen. Moreover, this notice was not a plan document that could amend or modify the unambiguous reservation of the right to modify, amend, or terminate the health plan, which is set forth in the relevant plan documents.

Snyder's retiree health benefits by enrolling him in the Company's active employees medical plan as of January 1, 2012 was not *de novo* wrong.   Pursuant to the methodology applied in this Circuit to review plan administrator benefits decisions, the Court further concludes Federal-Mogul's decision is due to be affirmed.

Upon due consideration, it is hereby ORDERED that Defendant Federal-Mogul Corporation's Motion for Summary Judgment (Doc. 16) is GRANTED, and Plaintiff Franklin D. Snyder's Dispositive Motion for Summary Judgment (Doc. 17) is DENIED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff, to terminate all other pending motions, and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 6th day of February, 2014.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
Maurya McSheehy